UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VINCE BRADLEY, JR.,

                          Plaintiff,                Case # 18-CV-6823-FPG

v.                                       DECISION AND ORDER

ANTHONY BONGIOVANNI, *et al.*,
                          Defendants.

## INTRODUCTION

Plaintiff Vince Bradley, Jr. brings this civil rights action against Defendants Police Sergeant Anthony Bongiovanni and the City of Rochester, alleging that Bongiovanni used excessive force against him in the course of an arrest.  ECF No. 1-2 at 4-13. On November 30, 2020, Defendants moved for summary judgment on all of Bradley's claims.  ECF No. 25.  Bradley opposes the motion.  ECF Nos, 31, 32.  For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  However, the non-moving party

1

"may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

Among the evidence proffered by the parties is video footage—taken from Bongiovanni's bodycam—of the encounter between Bradley and Bongiovanni. Video footage can, but does not always, conclusively establish facts for purposes of summary judgment. *See Scott v. Harris*, 550 U.S. 372, 379-80 (2007); *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017). Where a videotape "leaves no doubt as to what occurred," *United States v. Paul*, 904 F.3d 200, 203 (2d Cir. 2018), a district court need not countenance contrary factual assertions. *See Scott*, 550 U.S. at 380; *Heicklen v. Toala*, No. 08-CV-2457, 2010 WL 565426, at *2 (S.D.N.Y. Feb. 18, 2010). Conversely, if the video evidence is "ambiguous" or otherwise inconclusive, *Hicks v. Vill. of Ossining*, No. 12-CV-6874, 2016 WL 345582, at *5 (S.D.N.Y. Jan. 27, 2016), a court must employ its usual summary judgment standards and construe the evidence in the non-moving party's favor. *Accord Hulett*, 253 F. Supp. 3d at 482 ("[W]hile the video evidence submitted by the parties will certainly be considered and carefully reviewed at this juncture, . . . summary adjudication of a plaintiff's civil rights claim [is permitted] only in those exceptional cases where the video evidence in the record is sufficient to blatantly contradict one party's version of events." (internal quotation marks and brackets omitted)).

The initial circumstances of the encounter between Bradley and Bongiovanni are not recorded, so the Court relies on the undisputed facts and Bradley's deposition testimony. At the time of the incident, Bongiovanni was a sergeant with the Rochester Police Department. ECF No. 25-4 at 57-58. On the evening of September 2, 2017, Bongiovanni was on patrol in the area of

Lyell Avenue in Rochester. *Id.* at 62. While stopped at a red light at the intersection of Lyell Avenue and Murray Street, he observed an individual—later identified as Bradley—drive a dirt bike down Murray Street and stop at the intersection. *Id.* Bradley was not wearing a helmet, and his dirt bike did not have a license plate affixed to it. ECF No. 39 ¶¶ 10, 11. Bradley performed a U-turn at the intersection and proceeded back up Murray Street—the wrong way on a one-way street. *Id.* ¶ 10.

The parties do not dispute that Bongiovanni thus observed Bradley commit three traffic violations: he did not wear a helmet, his bike did not have a license plate, and he drove the wrong way on a one-way street. *Id.* ¶ 11. Under New York law, Bongiovanni was permitted to arrest Bradley for those violations. *See Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 214-15 (E.D.N.Y. 2015).

Bradley returned to his home, which was on Murray Street. Bongiovanni followed. Bongiovanni testified that he wanted to find Bradley to "speak with him" and "have a conversation with him about his illegal activity." ECF No. 25-4 at 71. After he had gotten off his bike, Bradley noticed a police car "just north" of his house. ECF No. 25-3 at 64. Bongiovanni yelled from his cruiser, "You, motherfucker on the dirt bike. Bring your mother-fucking ass here." *Id.* at 65. Bradley was in shock and replied, "Excuse me?" Bongiovanni repeated, "You, motherfucker on the dirt bike. Bring your ass here." *Id.* Bradley moved his bike, took his license from his pocket, and walked towards the cruiser. *Id.* He asked, "Is there a problem, Officer?" *Id.* Bongiovanni exited the cruiser and told Bradley he was under arrest. Bradley protested, "Under arrest? I got ID right here. I'm in my own yard. Write me a traffic ticket." *Id.* at 66. It is during this initial argument in Bradley's front yard that Bongiovanni's bodycam footage begins.

3

The video starts with Bradley walking down his driveway towards Bongiovanni.  The two talk over each other, with Bradley telling Bongiovanni not to "put his hands" on him, and Bongiovanni replying that Bradley cannot tell an officer what to do.  As they talk, Bradley backs away, and Bongiovanni follows.  Approximately fifteen seconds into their exchange, Bradley turns and sprints into the street, dodging as Bongiovanni attempts to grab him.  Bongiovanni runs after Bradley, ordering Bradley to "get down on the ground."  They run around Bradley's house, and Bongiovanni calls for backup.  Bradley returns to the front yard and runs up to his front door, telling a person inside to "open the door."  Bongiovanni reaches Bradley, attempts to grab him, and again orders him to get on the ground.  Bradley parries Bongiovanni's hands and protests, "Why you coming up on me?"  The pair move to the porch's railing, where Bongiovanni spins Bradley around and orders to put his hands behind his back.  Bradley continues to protest, saying he "knows his rights" and questioning why he is being arrested.  Bongiovanni repeatedly notifies Bradley he is under arrest and orders him to put his hands behind his back.  Bradley refuses to do so and continues to protest his arrest.

Approximately twenty-five seconds after Bongiovanni turned Bradley around—and with Bradley still refusing to place his hands behind his back—Bongiovanni discharges pepper spray towards Bradley's face.  (At his deposition, Bradley testified that Bongiovanni sprayed him twice; while the video does not show a second spray, the Court will assume as much for purposes of the motion.  ECF No. 25-3 at 85.)  Bradley leans away from the spray, and a woman appears from inside the home to object to Bongiovanni's use of pepper spray.  Bradley maneuvers off the railing and out of Bongiovanni's grasp, running onto the front yard.  Bradley turns around to face Bongiovanni but continues to back away as Bongiovanni repeatedly orders him to put his hands behind his back.

4

The video does not show clearly what occurs at this time in the front yard, but it appears that Bongiovanni strikes Bradley several times as Bradley backs up and attempts to evade the strikes.  At his deposition, Bongiovanni stated that he used his baton to strike Bradley once "on his lower left leg" and then, when his baton fell to the ground, he kicked Bradley several times in the hip.  ECF No. 25-4 at 104, 107-08.  Bradley testified to similar effect, claiming that Bongiovanni punched, kicked, and used a baton against him in the front yard.  ECF No. 25-3 at 86-87, 98, 100-101.

At this point, other police cars arrive, and Bradley takes off across the street and onto his neighbor's porch, where Bongiovanni and another officer grab him and attempt to take him down. The intervening officer tells Bradley to "get the fuck on the ground."  Because the bodycam is angled up, the video does not provide a clear view of Bradley's body or the force officers used against him.  It appears from the video that, initially, Bradley is taken down so that he is on his knees and elbows.  While holding the back of Bradley's neck Bongiovanni yells "knee strike" several times, each time followed by a muffled "thud" and Bradley shrieking. Bongiovanni explained at his deposition that, at this point, he had "pulled [Bradley's] waist downward and towards me to try to get him off the stairs" and had used "knee strikes into his buttocks and thigh area." ECF No. 25-4 at 180.  As Bongiovanni performs the knee strikes (or otherwise uses force against Bradley), the video shows that Bradley moves (or is moved) into a prone position. Bongiovanni then tells Bradley to put his hands behind his back and "don't fight."  The other officer tells Bongiovanni to back up, and Bongiovanni moves away from Bradley, so that the bodycam shows the other officer—with his knee on Bradley's leg—completing Bradley's handcuffing.  Meanwhile, Bradley wails loudly.  Once the handcuffing is complete, the other

officer gets up, Bradley rolls (or is rolled) so that he is resting on his side, and then he moves to a

sitting position.

At his deposition, Bradley offered a different narrative of what occurred once police caught

up to him on his neighbor's porch:

> I got to the door, I turned around.  [Bongiovanni] came - - I think he came up the stairs and they bumped me and I turned around.  I see all the lights, all the cars.  It's like a blur.  And I felt the punches, boom, boom, boom, boom, boom.  He is like, "Strike.  Strike."  . . . .
>
> He just kept yelling, "Strike, strike, strike, strike."  They like, "Get down, get down, get down, get down, get down."
>
> [I told them,] I can't, y'all.  Y'all, stop hitting me.  I'll be able to get down."  So I finally was kind of able to move.  One officer was choking me from the side on my neck trying to slam me down on the porch.
>
> I get down; I'm on my knees with hands behind my back, and that's when I felt kicks, kicks, kicks, punches, punches, punches, kick, kick, kick.
>
> And then I felt, I looked and I could feel like something put on my leg.  So I'm thinking they pulling me.  And I felt something on my hand, so I yelled.  And I'm like, "Why are you all punching me?  Why y'all beating on me?"
>
> The one cop telling me, "Shut up, bitch.  Shut up, bitch."  And they choking me at the same time.  "Stop resisting.  Stop resisting."  I'm on my knees on the porch.  I wasn't resisting.
>
> I told the officer, "If you stop kneeing on my side, maybe my body stop shaking if you all stop punching and kneeing me, and you can see that I am not" - - they put the cuffs on me.  I heard the other officer like, "Move, Sarge.  Move, Sarge," . . . .  But all I know is I felt like a bite or a sting or a stab or something.  At the time I wasn't fully aware of what it was, but now I know it was a dog.  They had a dog biting me on the ground attacking me when I'm in handcuffs.
>
> Thank God the cuffs was on and I had a watch on, otherwise my wrist might have been more torn up mangled.  At that point they picked me up.  The other officers is picking me up, jerking me, turning me around, slamming me on the porch, cussing at me, yelling at me.

6

ECF No. 25-3 at 87-89.  In essence, Bradley alleges that once officers apprehended him, they began punching and kicking him.  *Id.* at 105.  Once he dropped to his knees, officers continued to barrage him with punches and kicks, notwithstanding that he was neither resisting nor "even moving anymore."  *Id.* Officers struck him on his face, forehead, back, side, stomach, and legs. *Id.* at 106.  Even after he was handcuffed, a dog bit him his wrist and his leg and officers continued to "stomp" him on his back.  *Id.* at 106-07.  During this time, he was fully submissive and did not resist.  *Id.* at 111.

Ultimately, Bradley was arrested, taken into custody, and charged with, among other things, Operating an Unregistered Motorcycle, Resisting Arrest, Disorderly Conduct (Fighting/Violent Behavior), and Obstruction of Governmental Administration in the Second Degree.  ECF No. 39 ¶ 1.  Bradley later pleaded guilty to charges of Unlicensed Operation of a Motor Vehicle and Operating a Vehicle the Wrong Way on a One Way Street, with the other charges "covered by the plea."  *Id.* ¶ 2.

In September 2018, Bradley brought the present action in state court, which was then removed to this Court.  ECF No. 1.  In his complaint, Bradley raised five claims for relief against Bongiovanni, the City of Rochester, and the Rochester Police Department.  After motion practice, the only claims that remain are (1) a state-law assault and battery claim against Bongiovanni and, via vicarious liability, the City of Rochester; and (2) an excessive-force claim under 42 U.S.C. § 1983 against Bongiovanni.[1]  ECF No. 7.

---

[1] Bradley's complaint alludes to other claims that he does not address or defend on summary judgment.  First, he alleges that, in addition to using excessive force, Bongiovanni failed to provide him with "emergency medical treatment."  ECF No. 1-2 at 7.  Second, he claims that the City of Rochester had a "policy and custom" of tolerating excessive force like Bongiovanni's.  *Id.* at 11.  Insofar as Defendants have moved for summary judgment on all claims and Bradley has failed to address, let alone substantively defend, these claims, the Court deems them abandoned.  *See deVere Grp. GmbH v. Opinion Corp.*, 877 F. Supp. 2d 67, 70 n.3 (E.D.N.Y. 2012).

## DISCUSSION

Defendants move for summary judgment on both of Bradley's claims, arguing that (1) the force Bongiovanni used was objectively reasonable, (2) Bongiovanni is entitled to qualified immunity with respect to his uses of force, and (3) Bongiovanni cannot be held liable for the alleged dog bites.  ECF No. 25-8 at 9-17.

Bradley's claims—state-law assault and battery, and excessive force under the Fourth Amendment—are analyzed under the same standards, including those related to immunity from liability.[2]  *See Al-Mohammedi v. City of Buffalo*, No. 13-CV-1020, 2017 WL 163388, at *5-6 (W.D.N.Y. Jan. 16, 2017);  *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 587 (E.D.N.Y. 2013).  The Court therefore analyzes both claims together.  Furthermore, in assessing whether Bongiovanni's uses of force were unreasonable or excessive, the Court analyzes each use of force separately: (1) the application of pepper spray twice on Bradley's front porch; (2) the use of kicks, punches, and a baton in Bradley's driveway; (3) the knee and other strikes once Bradley was apprehended on his neighbor's porch; and (4) the use of a police dog in connection with Bradley's restraint on his neighbor's porch.  *See, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 96-98 (2d Cir. 2010) (analyzing excessive-force claims in that manner); *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994) (analyzing officer's actions by "carv[ing] up the incident into segments and judg[ing] each on its own terms to see if the officer was reasonable at each stage").

## I.    Pepper Spray

Concerning Bongiovanni's application of pepper spray on Bradley's front porch, the Court concludes that Bongiovanni is entitled to qualified immunity.

---

[2] Bradley does not argue otherwise.  *See generally* ECF No. 32.

"The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted).   "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotation marks omitted).   "To determine whether a defendant is entitled to qualified immunity, courts ask whether the facts shown 'make out a violation of a constitutional right' and 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Estate of Devine*, 676 F. App'x 61, 62 (2d Cir. 2017) (summary order) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

"As it relates to the second step, the focus is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (internal quotation marks omitted).   The Supreme Court has warned that the use of excessive force "is an area of the law in which the results depends very much on the facts of each case," and general statements of the law "do not by themselves create clearly established law" outside the obvious cases.   *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal quotation marks omitted) ("[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.").   In other words, specificity "is especially important" in these sorts of cases.   *Id.* at 1152.   Thus, "[a]lthough a case does not need to be directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Estate of Priolo v. City of New York*, No. 15-CV-6080,

9

2019 WL 1428403, at *4 (E.D.N.Y. Mar. 29, 2019) (internal quotation marks omitted).  "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force, and thereby provide an officer notice that a specific use of force is unlawful . . . ."  *Id.* (internal quotation marks omitted).

In this case, the Court concludes that Bongiovanni is entitled to qualified immunity because Bradley's right to be free from excessive force in this context was not clearly established.  A pair of Second Circuit cases provides helpful guidance on this issue.

The first is *Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015) [hereinafter "*Brown I*"], which gives some contours for a claim of excessive force relating to the use of pepper spray.  In *Brown I*, two police officers were called to a closed Starbucks location based on a report that "[s]ix people [were] banging on the doors refusing to leave."  *Brown*, 798 F.3d at 96.  The group was apparently trying to get into the store to use the bathroom.  *Id.*  When the officers arrived, they observed the plaintiff, a 120-pound woman.  *Id.*  The plaintiff asked the officers where she could find a bathroom, and the officers responded rudely, stating, "What do we look like, the potty police?", and "piss in the park."  *Id.*

The plaintiff walked away and the officers exited their cruiser, requesting the plaintiff's identification.  The plaintiff refused the request, and one of the officers threatened to place her under arrest if she did not comply.  *Id.* at 96-97.  The plaintiff again refused.  The officers "then grabbed her arm, held it behind her back, and attempted to apply handcuffs.  An officer kicked her legs out from under her, and she fell to her knees."  *Id.* at 97.  The officers were able to apply one of the handcuffs to the plaintiff's right wrist "before she was thrown to the ground."  *Id.*  The plaintiff's left arm "was under her as she fell to the ground," and "officers endeavored to take hold of [it] and bring it behind her to complete the handcuffing."  *Id.* at 101.  The plaintiff "did not offer

10

her arms for handcuffing," in part because "she was trying to keep hold of her phone and wallet and reach for the scattered contents of her purse." *Id.*  One of the officers "twice administered a burst of pepper spray directly to [the plaintiff's] face."  Thereafter, the officers were able to complete the handcuffing and placed the plaintiff into the police car.  The plaintiff was later charged with disorderly conduct. *Id.* at 97.

The Second Circuit concluded that, at summary judgment, the plaintiff presented sufficient evidence to state a viable claim for excessive force.  The court noted that "whether the force used is excessive is to be analyzed under [the Fourth] Amendment's 'reasonableness' standard," which includes consideration of three factors: (1) the severity of the crime at issue; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 100 (citing *Graham v. Connor*, 490 U.S. 386 (1989)).  Reasonableness is judged "from the perspective of a reasonable officer on the scene." *Id.*

As to the first factor, the court noted that "the severity of the crime [was] unquestionably slight," since a "disorderly conduct offense is subject to a maximum penalty of fifteen days in jail," and the underlying facts consisted of "loud banging on the door of a closed store by someone wanting to use a bathroom, plus the use of loud and nasty language." *Id.* at 102.  On the second factor, the plaintiff "posed no threat whatever to the safety of the officers or others." *Id.*  On the third factor, the court noted that the plaintiff "was not fleeing," attacking, or physically threatening either officer. *Id.*  The plaintiff's "resistance" was "a refusal to permit the easy application of handcuffs by placing her hands behind her back." *Id.*  The court rejected the notion that such "resistance" permitted the officers to "use substantial force, including taking a person to the ground and incapacitating her with pepper [spray], to accomplish handcuffing." *Id.*  The plaintiff was a

120-pound woman and the officers significantly outweighed her, which suggested that the officers could have, instead of using pepper spray, "simply held one of her arms, brought it behind her, and put handcuffs on her wrists." *Id.* at 102-03.  Reviewing these factors, the Second Circuit concluded that a jury would "have to decide whether Fourth Amendment reasonableness was exceeded when [the plaintiff] was taken to the ground after refusing to put her hands behind her back and when officers struggled with her on the ground and used pepper spray to accomplish handcuffing." *Id.* at 103.

In light of *Brown I*, it could be argued that Bradley has a cognizable excessive force claim based on Bongiovanni's use of pepper spray.  There are some similarities between the facts in *Brown I* and the present case.  Like the *Brown* plaintiff, Bradley's "crimes" were "unquestionably slight"—a few traffic violations.  *See Brown I*, 798 F.3d at 102.  In addition, as in *Brown I*, Bradley posed no threat to the safety of Bongiovanni or others: while he evaded restraint and fled, Bradley did not threaten or attack Bongiovanni or others.

But there a several considerations which the Second Circuit found significant in *Brown I* that are not present here.  In assessing the third factor, the Second Circuit noted that the plaintiff's "resistance" to arrest was merely a "refusal to permit the easy application of handcuffs by placing her hands behind her back." *Id.*; *see also id.* at 103 (stating that the plaintiff's was a "non-threatening form of resistance" that amounted to an "unwillingness" to "offer hands for handcuffing").  Furthermore, at the time the officers applied the pepper spray, the plaintiff was already restrained on the ground and held down by two officers who significantly outweighed her. The degree of force they employed could be found to be disproportionate to the type of resistance they encountered.  *See Brown I*, 798 F.3d at 102-03 (questioning why officers did not employ a "less aggressive way of accomplishing [the] arrest").

12

The situation presented here is materially different.  For one thing, Bradley's resistance was more egregious—he actively evaded Bongiovanni's attempts to restrain him, ran away, and repeatedly refused to obey commands to get on the ground and to place his hands behind his back. He was not simply making the task of handcuffing more difficult, but actively resisting any and all attempts to be restrained.  In addition, Bongiovanni had less control over the situation than the officers in *Brown I*.  He was effectuating the arrest alone.  He had not taken Bradley to the ground or otherwise already restrained him at the time he applied the pepper spray.  In contrast to *Brown I*, it cannot be said that "less aggressive technique[s]" were readily available to Bongiovanni. *Brown I*, 798 F.3d at 102-03 (suggesting that each officer could have grabbed one of the plaintiff's arms to effectuate the handcuffing, or could have "simply surrounded her" to "mak[e] clear that she could not leave until she submitted to handcuffing").

For present purposes, the Court need not definitively decide whether Bongiovanni's use of pepper spray actually constituted excessive force in light of *Brown I*.  It suffices to make two observations.  First, *Brown I* clearly establishes that, *in some circumstances*, application of pepper spray may constitute a disproportionate response to a suspect's resistance to arrest and/or handcuffing.  Second, prior to *Brown I*, that principle was *not* clearly established.

The Second Circuit reached this latter conclusion in a companion case, *Brown v. City of New York*, 862 F.3d 182 (2d Cir. 2017) [hereinafter "*Brown II*"].  In *Brown II*, the Second Circuit upheld a grant of qualified immunity to the officers in *Brown I* on the plaintiff's excessive force claim. The court could find no precedential decision establishing that  it was unreasonable for the officers to use the force they did in response to the plaintiff's "repeated[] refus[al] to follow the instructions of police officers who were attempting to apply handcuffs to accomplish an arrest." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) [hereinafter "*Brown II*"].  The critical

13

fact distinguishing the plaintiff's situation from prior cases was that officers applied pepper spray "prior to, and in furtherance of, [their] attempts to accomplish the handcuffing." *Id.* at 191.  This was unlike, for example, *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010), in which the plaintiff alleged that a police officer used pepper spray against him while he was "already in handcuffs and offering no further active resistance." *Tracy*, 623 F.3d at 98.  The *Tracy* court found that "no reasonable officer could have believed that he was entitled to use pepper spray *gratuitously against a restrained and unresisting arrestee*." *Tracy*, 623 F.3d at 99 n.5 (emphasis added).  Because "[n]o precedential decision of the Supreme Court or [the Second Circuit] clearly establishe[d] that the [officers'] actions [], viewed in the circumstances in which they were taken, were in violation of the Fourth Amendment," qualified immunity was appropriate.  *Brown II*, 862 F.3d at 190.

In sum, it could be said that *Brown I* established a new legal principle—that an arrestee's mere "refusal to permit the easy application of handcuffs" does not necessarily justify the application of pepper spray.  *Brown I*, 798 F.3d at 102; *see also Brown II*, 862 F.3d at 190.  But even though that legal principle may govern Bradley's excessive-force claim,[3] Bongiovanni is still entitled to qualified immunity unless that legal principle *clearly* prohibited Bongiovanni's conduct "*in the particular circumstances before him*." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (emphasis added).  *Brown I* must have "placed the conclusion" that Bongiovanni acted unreasonably "beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 14 (2015).  This is because, if the

---

[3] Bradley does not identify any other decision that clearly establishes his right to be free from excessive force under these circumstances.  Cases like *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010) and *Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020), are distinguishable because they involve arrestees who were no longer resisting arrest at the time the officers applied the pepper spray (as in *Tracy*) or used the taser (as in *Jones*).  *See Tracy*, 623 F.3d at 99 n.5; *Jones*, 963 F.3d at 238; *see also Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (contrasting *Jones* with *Brown II* and noting that *Brown II* involved an "actively resisting, non-handcuffed arrestee"); *Muschette v. Gionfriddo*, 910 F.3d 65, 71 n.2 (2d Cir. 2018) (upholding qualified immunity award, where police officer tased twelve-year old deaf student whom he reasonably believed was disobeying his orders).

14

"right at issue" has "been addressed only in a factual context that is distinguishable in a fair way" from the present case, "a reasonable officer might not have known that the challenged conduct was unlawful." *Walczyk v. Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) (internal quotation marks omitted).

So it is here: while the holding in *Brown I* may apply, its facts are not so analogous to Bradley's situation as to place the constitutional question beyond debate. Indeed, the *Brown I* court made clear that its analysis was fact-sensitive and did not imply any bright-line rule. *See, e.g.*, *Brown I*, 798 F.3d at 102 ("All that can realistically be expected is to make some assessment as to the extent to which each relevant factor is present and then somehow make an aggregate assessment of all the factors."); *id.* at 103 ("The continuum along which the excessiveness of force in making an arrest is assessed is not marked by visible signposts."). As discussed above, the situation Bongiovanni faced was materially different from that faced by the officers in *Brown I*— he was by himself, attempting to arrest a suspect who had actively evaded restraint, fled, and flouted commands. At the time he was pepper sprayed, Bradley was refusing to place his hands behind his back. *Brown I* simply cannot be read to settle the question of whether pepper spray may be appropriately used in response to these more active forms of resistance and flight, especially where the officer is by himself and has not otherwise been able to restrain the suspect. Because *Brown I* does not place the issue beyond debate, Bongiovanni is entitled to qualified immunity. Therefore, summary judgment is granted.

## II.   Kicks, Punches, and Baton

For similar reasons, the Court concludes that Bongiovanni is entitled to qualified immunity, and therefore summary judgment, to the extent Bradley's claims are premised on the kicks, punches, and/or baton strikes Bongiovanni employed once Bradley moved off his front porch. The

undisputed facts—*i.e.*, the bodycam footage—establish that Bongiovanni struck Bradley with kicks, punches, and his baton only after Bradley shook Bongiovanni's hand off of him, again attempted to flee, and repeatedly refused to obey Bongiovanni's commands to put his hands behind his back.  That is, Bradley was still actively resisting arrest and making attempts to flee when Bongiovanni struck him.

The Court can find no precedential decision that clearly establishes Bradley's right to be free, under these circumstances, from the force Bongiovanni used against him.  To the contrary, courts have permitted this kind of force to be employed against an actively resisting suspect.  In *Tracy*, the Second Circuit agreed that an officer used a reasonable degree of force during a nighttime traffic stop when he struck the plaintiff four times with a metal flashlight.  *Tracy*, 623 F.3d at 93.  The officer had ordered the plaintiff out of the vehicle and commanded him to place his hands on his head.  According to the plaintiff, as he turned around, he slipped on a patch of ice and "grabbed the car to prevent himself from falling." *Id.*  The officer struck the plaintiff twice with the flashlight.  The plaintiff then attempted to run, but the officer grabbed him, the "two struggled," and the officer "hit him twice more with the flashlight." *Id.*

The Second Circuit found that the officer's actions were reasonable.  Although the plaintiff asserted he had only slipped on ice, from the officer's perspective, it appeared that the plaintiff had "made a quick and sudden movement." *Id.* at 97.  Because the officer was attempting to "effect an arrest without the assistance of other officers," his decision "to use his flashlight to protect himself and subdue an arrestee he perceived to be actively resisting" was a "reasonable response." *Id.*  The court emphasized that the plaintiff's "slip and fall" looked like a "fail[ure] to comply with a direct order" and "active[]" resistance to arrest, which "necessitate[ed] a forceful response." *Id.*

16

*Tracy* teaches that a police officer may "forcefully" respond to active resistance to arrest, and that such response may include strikes from a blunt object to the extent such force is otherwise proportionate and reasonable.  *See Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000) (noting that, although resistance to arrest "no doubt justifies the officer's use of *some* degree of force," it does not "give the officer license to use force without limit").  Much like the use of pepper spray, with respect to the use of strikes or blunt force, courts in the Second Circuit have drawn a distinction between using such force to quell active resistance to arrest and using such force on a non-resisting or compliant arrestee, the former tending to be constitutionally permissible.  *Compare Tracy*, 623 F.3d at 97, *Husbands v. City of New York*, 335 F. App'x 124, 129 (2d Cir. 2009) (summary order) (officer's punch to arrestee's torso was not excessive force because it "was necessary to subdue [the arrestee] and apply handcuffs"), *and Gutierrez v. New York*, No. 18-CV-3621, 2021 WL 681238, at *15 (E.D.N.Y. Feb. 22, 2021) (collecting cases and concluding that "tackling or shoving a plaintiff down to the ground can be an objectively reasonable response to a plaintiff resisting arrest"), *with O'Hara v. City of New York*, 570 F. App'x 21, 24-25 (2d Cir. 2014) (summary order) ("[N]o reasonable officer confronting the circumstances of this case . . . could have thought that the law authorized him repeatedly to punch an unarmed, non-menacing 17 year old in effecting an arrest."), *Cox v. Fischer*, 248 F. Supp. 3d 471, 481 (S.D.N.Y. 2017) (finding excessive force where officer "punched [the plaintiff] in the jaw with a closed fist and pushed him to the ground" even though the plaintiff  was not "actively resisting arrest"), *and Outlaw v. City of Hartford*, No. 07-CV-1769, 2016 WL 591753, at *6 (D. Conn. Feb. 12, 2016) ("[A] reasonable officer . . . would have little doubt about the unlawfulness of repeatedly striking an unresisting man with his baton.").

Here, it cannot be disputed (given the bodycam footage) that Bradley was actively resisting arrest, so the case law pertaining to excessive force against a compliant or non-resisting arrestee is inapplicable.  Instead, given Bradley's active resistance to arrest, Bongiovanni was permitted to use *some* degree of force to effectuate the arrest.  *See Sullivan*, 225 F.3d at 165-66.  Still, the issue of whether Bongiovanni's chosen means of force was excessive may be debatable given the surrounding circumstances, including Bradley's non-threatening behavior and the minor violations he committed.

But for purposes of qualified immunity, what is evident is that the Court has before it no precedential decision that places the issue "*beyond* debate."  *Mullenix*, 577 U.S. at 14 (emphasis added).  At most, the Court can discern from the case law that an officer may use *some* degree of force to quell resistance to arrest, and said case law provides a general architecture for assessing the reasonableness of force in that context.  More is required to overcome qualified immunity, however.  *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 504 (2019) (stressing the "need to identify a case where an officer *acting under similar circumstances* was held to have violated the Fourth Amendment" (emphasis added)).  Accordingly, Bongiovanni is entitled to qualified immunity as to these uses of force.

## III.   Neighbor's Front Porch

The Court reaches the opposite conclusion with respect to Bongiovanni's uses of force against Bradley once he was apprehended on his neighbor's front porch.  As the Court has discussed, the Second Circuit has drawn a sharp distinction between force used to respond to and quell active resistance to arrest, and force used *after* such resistance has been overcome.  *See Lennox*, 968 F.3d at 157; *Jones*, 963 F.3d at 230; *Brown II*, 862 F.3d at 191-92.  As of September 2017, it was clearly established that "it is impermissible to use significant force against a restrained

18

arrestee who is not actively resisting." *Lennox*, 968 F.3d at 157.  This is so even if the arrestee had previously been resisting arrest before being apprehended.  *See Jones*, 963 F.3d at 230; *Tracy*, 623 F.3d at 98-99 & n.5 ("[T]he use of entirely gratuitous force is unreasonable and therefore excessive."); *see also Depalma v. New York State*, No. 14-CV-58, 2016 WL 1305972, at *4-5 (N.D.N.Y. Mar. 31, 2016) (no qualified immunity to officer who slammed his knee into plaintiff's face after plaintiff "had stopped resisting"); *Whitfield v. City of Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *21-22 (S.D.N.Y. Dec. 17, 2015) (collecting cases).

In this case, there is a genuine dispute of material fact as to whether Bradley had stopped resisting once he was apprehended on his neighbor's porch.   Unlike Bradley's earlier resistance to arrest, the bodycam footage does not offer a clear picture of what Bradley was doing once he was apprehended.  Because this is not a case where the "videotape leaves no doubt as to what occurred," *Paul*, 904 F.3d at 203, the Court must accept Bradley's narrative to the extent it is not blatantly contradicted by the bodycam footage.  That means that the Court must accept Bradley's claim that he was no longer resisting once officers apprehended him on his neighbor's porch.  ECF No. 25-3 at 88, 105, 108-11.  Despite this alleged lack of resistance, officers used a significant degree of force against Bradley, either several knee strikes (as Bongiovanni claims), or kicks, punches, and stomps (as Bradley alleges).  *See* ECF No. 25-3 at 89-90, 116 (deposition of Bradley) (stating that, after he was arrested, he was unable to walk, his shoulder and back hurt "really bad," and he later suffered from chronic leg, rotator-cuff, and back issues); *see also Tracy*, 623 F.3d at 98 (stating that a use of force that inflicts "incapacitating and painful effects" constitutes a "significant degree of force"); *Hicks v. Craw*, 405 F. Supp. 3d 374, 381 (N.D.N.Y. 2019) (noting that knee strikes to plaintiff's body were "a substantial amount of force").

In light of these facts, Bradley has a viable excessive force claim and Bongiovanni is not entitled to qualified immunity at this stage. At least since *Tracy*, it has been "clearly established that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others . . . violates the Fourth Amendment." *Jones*, 963 F.3d at 226. This is true even if Bradley had yet to be handcuffed; a reasonable jury could find that officers used a degree of force that was disproportionate to what was needed to complete the handcuffing. *See Jones*, 963 F.3d at 238 (agreeing that "the fact that a previously resisting arrestee had not yet been handcuffed may be an important factor in assessing the reasonableness of an officer's force" but rejecting the notion that "the need to complete the arrest authorizes an additional level of force which would not be reasonably necessary to allow the officers to handcuff that arrestee safely and without further incident").

Accordingly, Bradley's claims as they relate to the force used on the neighbor's porch will not be dismissed.

## IV.    Dog Bite

Finally, the Court cannot conclude that Defendants are entitled to summary judgment on Bradley's claims relating to the police dog. The parties appear to agree that Bongiovanni did not command a police dog to bite Bradley, ECF No. 39 ¶ 29, but Bradley contends that Bongiovanni may be held liable for his failure to intervene. ECF No. 32 at 14-16. In response, Defendants argue that this claim fails because there is no evidence that (1) any officer "instructed, commanded or directed a police dog to bite [Bradley]," (2) Bongiovanni knew the dog was biting Bradley; (3) Bongiovanni had an opportunity to intervene; or (4) Bongiovanni intentionally refused to take

reasonable measures to end the use of force.[4]  ECF No. 33 at 5-6.  The Court is not persuaded that any of these arguments merits dismissal.

Viewed in the light most favorable to Bradley, the evidence is sufficient to allow a reasonable factfinder to conclude that the police dog's handler commanded the dog to attack Bradley and that Bongiovanni was aware that the dog was biting Bradley but did not take any steps to stop the dog.  The video reveals that Bongiovanni called for backup when Bradley initially ran around his house.  When Bradley subsequently fled towards his neighbor's home, other officers arrived at the scene and converged on Bradley.  Because of the bodycam's angle during the altercation on the neighbor's porch, the video evidence does not resolve whether or to what extent a police dog bit Bradley.  *See Paul*, 904 F.3d at 203.  But it clearly shows that, once Bradley was handcuffed, a police dog and its handler were standing just a few feet away from the porch. Furthermore, Bradley alleges that a dog bit him on the wrist and "shook" his leg during the altercation on the neighbor's porch.  ECF No. 25-3 at 107, 111-12.

From such evidence, a reasonable jury could conclude that the police dog's handler directed the dog to bite or otherwise restrain Bradley.  Even without the handler's direct testimony, such an inference may be drawn from the circumstantial evidence.  A K-9 handler took a trained police dog to the scene of a fleeing suspect.  The fleeing suspect was taken down and restrained, and the police dog grabbed the suspect's leg and bit his arm—the exact sort of behavior one would expect a police dog to perform on command in such circumstances.  Given the dog's training and its behavior, it would be reasonable to conclude that the dog acted at the command of the handler.

---

[4] In passing, Defendants also state that Bradley failed to plead a "failure to intervene" claim in his complaint.  ECF No. 33 at 5.  Because they do not develop this argument, the Court declines to address it.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Similarly, a reasonable jury could conclude that Bongiovanni was aware that the dog bit Bradley at the handler's command.  Although Bongiovanni denies that he even saw the dog bite Bradley, ECF No. 25-4 at 181, one could reasonably infer that a police officer who is actively restraining a suspect would be aware of a police dog immediately next to him biting the suspect.  By extension, a reasonable jury could infer that Bongiovanni failed to take steps to intervene, insofar as he "stood by and did nothing" while the dog attacked Bradley with the handler nearby.  *Mayo v. Doe*, 480 F. Supp. 3d 395, 401 (D. Conn. Aug. 2020).

The Court must also reject Defendants' argument that Bongiovanni was incapable of intervening because he was not "trained in or capable of [] dog handling."  ECF No. 33 at 6.  Even if Bongiovanni could not command the dog himself, the Court can discern no reason why Bongiovanni could not have simply asked the dog's handler to order the dog away.  *See Moya v. City of Clovis*, No. 18-CV-494, 2019 WL 6255217, at *9 n.7 (D.N.M. Nov. 22, 2019) (noting that, where officer could not have commanded or controlled police dog, his "ability to intervene and stop the force . . . was necessarily limited to orders he could have given to [the handler]").  This was not an unruly mutt but a trained police dog that, presumably, would have followed the handler's orders.  *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925 (11th Cir. 2000) (officer could be held liable for failing to intervene when police dog attacked suspect, where officer "watched the entire event and was in voice contact with [the handler]"); *Nuzzo v. Devine*, 494 F. Supp. 3d 232, 238 (D. Conn. 2020) (rejecting argument that officers "had no legal authority to second-guess the dog handlers' decisions about when and how to deploy their dogs").

Accordingly, none of Defendants' arguments justifies dismissal of the claims premised on the alleged dog bites.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 25) is

GRANTED IN PART AND DENIED IN PART.  Bradley's state and federal claims are dismissed

except insofar as they relate to (1) Bongiovanni's uses of force on the neighbor's porch, and (2)

Bongiovanni's failure to intervene to stop the dog attack.

IT IS SO ORDERED.

Dated: August 17, 2021
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York